IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 19-cv-02053-RBJ

DEBORAH NEER and JEREMY NEER, personally, and as next friends for TN, a minor,

      Plaintiffs,

v.

PARK COUNTY SCHOOL DISTRICT RE NO. 2,

      Defendant.

---

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

This matter is before the Court on defendant's motion for summary judgment, ECF No. 37 (ECF No. 50 is the public entry representing the restricted filing at ECF No. 37); plaintiffs' motion for partial summary judgment, ECF No. 45; and defendant's motion in limine, ECF No. 67.

## I. FACTUAL BACKGROUND

This case involves Park County School District's alleged discrimination against T.N., a student, in violation of both Section 504 of the Rehabilitation Act and Title II of the American with Disabilities Act ("ADA").  The following facts are not in dispute.

T.N. was a student at South Park Middle School in Fairplay, Colorado during seventh grade and part of eighth grade.  On October 18, 2018 V.H., another South Park student, and T.N. got into a fight during their physical education class.  The two girls fought for approximately

1

thirty seconds, and T.N. sustained numerous injuries as a result of the fight, including a concussion.  ECF No. 38.

Following the fight Mr. Wedow, the physical education instructor, walked the girls to the school's administrative office.  The principal, Andrew Fieth, spoke with V.H. while Kyle Graff, the athletic director and dean of students, spoke with T.N.  ECF No. 39-2 at 53:8-19.  At that time V.H. confirmed that she threw the first punch to start the altercation.  ECF No. 39-2 at 54:5-7.  The girls' parents arrived at the middle school, and both T.N. and V.H. were suspended.  ECF No. 39-2 at 64:20–65:4.  Prior to the altercation, T.N. and V.H. had been friendly with one another, and they regularly ate lunch outside together during the lunch period.  ECF No. 39-3 at 57:1-5.

Following the fight T.N. went to the doctor to determine the extent of her injuries.  She was diagnosed with a broken nasal cavity and a concussion.  ECF No. 51-5 at 62:9-14.  On October 31, 2018 Lucy Downare, the school secretary, emailed all school staff notifying them that "T.N. will be out today and tomorrow with a possible concussion."  ECF No. 39 at 4.  On November 1, 2018 T.N. underwent testing and treatment at Centura Health Physician Group where she was diagnosed with a concussion.  Mr. Norton, a Physician's Assistant, stated that due to the concussion, T.N. would require academic accommodations.  ECF No. 51-1 at 2.  These accommodations included giving T.N. extra time to complete tests; putting T.N. in a quiet environment during tests; allowing her multiple sessions to take a test; reducing length of tests; eliminating tests when possible; reformatting tests from free response to multiple choice; allowing T.N. to obtain notes prior to class; reducing the overall amount of make-up work and homework; shortening tests and projects; permitting T.N. to take breaks to control symptom

levels; and allowing T.N. to turn in assignments late.  *Id.*  The evaluation further stated that T.N.

should not return to school until November 5, 2018.  *Id.*  The accommodations notification was

faxed to the school in the later afternoon hours of Thursday, November 1, 2018.  However,

because South Park Middle operates on a four-day school schedule, this fax was not received

until November 5, 2018.  ECF No. 51-3 at 2.

On November 5, 2018 at 7:43 AM Ms. Bodelson, the school's registered nurse, sent an

email to all of T.N.'s teachers that read,

> You are all listed on TN's schedule so I am just letting you know that she has had a
> concussion and is now on post-concussion protocol. This means that she should be
> allowed to take extra time to complete tests, take tests in a quiet room, if possible use
> multiple choice as opposed to free response, help her with notetaking (give slides ahead
> of time if you have them or let her collaborate with another student in class), let her take
> breaks in class if she seems tired/unable to concentrate, and allow her extra time to turn
> in assignments if needed.  She has a follow up eval with the doctor on the eighth so I will
> update you all when I have more info.

ECF No. 39 at 16.  Ms. Bodelson did not include the full list of accommodations recommended

by T.N.'s provider.  Notably she did not include the overall workload reduction of 50 percent to

75 percent.  *See* ECF No. 30 at 16.  Nurse Bodelson did not confirm whether teachers followed

the post-concussion protocol.  Instead, she assumed that the teachers were following it because

T.N. visited her office so frequently to rest.  Additionally, despite her promise to update the

teachers once she had more information on T.N.'s condition, Nurse Bodelson never did so.

The school and T.N.'s parents were concerned about T.N's returning to school following

her injuries.  At a staff meeting Mr. Graff raised these concerns to the staff and instructed the

staff members to keep a close eye on both T.N. and V.H. to ensure there were no further

incidents between them.  ECF No. 39-4 at 78:18–79:3.  Additionally, on November 6, 2018,

T.N.'s first day back, Mr. Graff met with her prior to the start of the school day to determine

what, if anything, the school could do to facilitate a seamless transition.  Mr. Graff gave T.N. the

option of returning to her classes or of working in the administrative office near him.  T.N. chose

the latter and worked in the administrative office for two days prior to returning to her classes.

*Id*. 84:2-19.  Mr. Graff did not consider this to be an accommodation for a disability.  Instead, he

just thought "it was a great way for her to transition back into . . . a regular schedule."  *Id*. at

86:18-25.  Once T.N. was ready to return to a normal schedule, school administrators changed

her schedule to ensure she had as few classes as possible with V.H.  T.N.'s electives were

changed; however, due to the school's small size, her core classes could not be changed.  ECF

No. 39-4 at 69:13-21.  Therefore, T.N. and V.H. remained in some classes together.  However,

they were put on opposite sides of the room to prevent any interaction.  ECF No. 51-3 at 83:16-

22.

      As T.N. began her transition back to school, Mrs. Neer communicated regularly with

school staff via email about her daughter's condition.  On November 15, 2018 Mrs. Neer emailed

Mr. Graff and stated

> My daughter has continuous headaches and she started physical therapy yesterday.  The
> therapist said she didn't want TN to do last two periods of school. I'm not sure what to do
> here because now my daughter has a F in a class and she has to go to appointments
> during the week. . . I need your help please! I need teachers to work with my daughter so
> she doesn't slip with school work.  Tests cannot be on a  computer for TN at this time.
> Dr. said no computers.  And teachers need to give TN time to prepare for any tests.
> Please forward this email onto all teachers and I would like to have weekly updates on
> my daughter's status with homework or grades so she stays on top of it.  She's going
> through a lot right now so we need to be sure Drs orders are followed but yet maintain
> her grades so she doesn't fail. Please update me.

ECF No. 39 at 13.  Mr. Graff claims he passed Mrs. Neer's email onto the teachers.  However,

he did not email Mrs. Neer back and give her a detailed response or update.  Instead, he

responded that he received the email and "left it at that" because he is "not a big e-mailer."  ECF

No. 51-8 at 102:13-18.  Although he did not email her to discuss T.N.'s progress, Mr. Graff

states he did have phone calls with Mrs. Neer from time to time.  *Id*. at 101:23-24.

Mrs. Neer also regularly corresponded with Nurse Bodelson.  Ms. Bodelson emailed Mrs.

Neer anytime that T.N. came to her office to rest or complained of headaches.  Occasionally Ms.

Bodelson, with Mrs. Neer's permission, would give T.N. ibuprofen to help T.N. manage her

concussion symptoms and pain.  *See* ECF No. 39 at 17–24.  It is estimated that from the time

T.N. returned to school to the time of her withdrawal from South Park, she went to the nurse's

office approximately ten times.  ECF No. 51-2 at 4.

During this time T.N. had continual doctors' appointments for her concussion symptoms.

On November 16, 2018 Centura Health Group again emailed the school to let them know that

T.N. had a "severe concussion."  ECF No. 51-1 at 3.  Additionally, on November 30, 2018

T.N.'s medical providers sent another letter.  It stated,

> It is my medical opinion that [T.N.] has a moderate to severe concussion.  She is
> struggling with severe daily headaches as a result.  We are now proceeding with an MRI
> of her brain and [will] likely obtain a neurology consultation within the near future.
> Please accommodate [T.N.] in any way possible with her schoolwork.

ECF No. 51-1 at 14.

Mrs. Neer also communicated with T.N.'s teachers.  On November 29, 2018 Mrs. Neer

emailed Lori Slifka, T.N.'s science teacher.  In that email Mrs. Neer requested that Ms. Slifka

forward the email to T.N.'s other teachers and provide them with Mrs. Neer's email address.

Mrs. Neer hoped T.N.'s other teachers would contact her if T.N. was at risk of either a D or F

grade.  ECF No. 39 at 25.  On November 29, 2018 Ms. Slifka emailed all of T.N.'s teachers and

Andy Fieth, the school's principal, and stated

> T.N.'s mom has been emailing me this week about T.N.'s missing work and is hoping to have some contact from you regarding her work as well. Please reach out to Debbie about how to keep T.N. up to date with work and what might need to be completed from her absences.  T.N. is still dealing with her headache from the concussion she received.

ECF No. 39 at 25.  On November 30, 2018 Teri Moore, T.N.'s math teacher, emailed Mrs. Neer and stated "T.N. has a packet of math worksheet[s].  2 per day. That will take her almost to Christmas break. She is working well when in class."  *Id*. at 26.  On December 3, 2018 Teri Moore again emailed Mrs. Neer and stated, "[h]er grade is currently showing 68% but in reality it is a C. Once she finishes her packet the grade will go up. Sure enjoy having her in class! Sorry she has to deal with the concussion issues."  *Id*.

Curtis Long, T.N.'s social studies teacher, emailed Mrs. Neer on December 3, 2018.  *Id*. at 27.  In that email he provided Mrs. Neer with an itemized list of assignments that T.N. had not turned in for his class and a google classroom link where T.N. could access class notes.  He encouraged Mrs. Neer to contact him if she needed more information on T.N.'s academic progress.  *Id*.  Richard Boland, T.N.'s Spanish teacher, did not respond to Mrs. Neer's request because "T.N. was keeping up with her assignments" and not at risk of a D or F grade in his class.  ECF No. 39-6 at 3.  Katherine Mueller, another one of T.N.'s teachers, similarly never emailed Mrs. Neer because T.N. was keeping up with coursework and did not have a D or F in the class.  *Id*. at 12.

However, Elizabeth Torrez, T.N.'s STEM teacher, did not respond to Mrs. Neer's email and ultimately assigned T.N. an F grade.  Mrs. Torrez states that she gave T.N. extra time to complete assignments and excused T.N.'s absences.  She also stated "[b]ased on my observations of TN, she was able to do the work, she just chose not to do it."  ECF No. 39-6 at 15.  Finally, she stated that "T.N.'s parents never communicated any concerns to me about T.N.'s academic

performance or final grade in STEM class.  T.N. never asked me for additional time to complete the work."  *Id*.

At some point T.N. communicated with her parents about her frustrations that not all of her teachers were accommodating her temporary disability.  According to T.N., she was not always allowed to leave to go to the nurse's office, nor was she allowed to complete a test on paper rather than on a computer.  ECF No. 39-8 at 11-22.  According to Mrs. Neer, T.N. came home daily frustrated and crying.  Mrs. Neer stated that

> [T.N.] was just so stressed out because the teachers were not following the doctor's recommendations, and she was getting stressed out because she was made to go on the computer and take these exams or these tests and do homework assignments on the computer versus not on the computer.  And we dealt with this quite frequently.  And my daughter was in tears every day.

ECF No. 39-5 at 104:15–105:3.  When asked which teachers refused to accommodate T.N.'s disability, Mrs. Neer responded that Mrs. Torrez did, though she could not remember which class Mrs. Torrez taught.  *Id*. at 105:4-8.  When presented with evidence that teachers provided some accommodations—like allowing T.N. to retake a test or turn an assignment in late—Mrs. Neer stated she could not trust the school's records.

Each of the school district's deponents confirmed the importance of accommodating individuals with temporary disabilities, and many of them acknowledged that they had dealt with concussed students in the past.  While defendant did not have a concussion-specific policy, many district officials stated that when dealing with concussions, it is imperative to follow the medical provider's recommendations.  ECF Nos. 51-10 at 21:13-25; *see also* ECF No. 51-2 at 4 ("The District's practice is to follow the concussion protocols provided by a diagnosing physician . . . .").

Mrs. Neer ultimately withdrew T.N. from South Park Middle in January 2019.  The Neers moved to Colorado's front range and enrolled T.N. as a student in the Jefferson County School District.  ECF No. 51 at 9.  T.N. continued seeing medical professionals and received treatment at Children's Hospital in Denver.  In addition to her concussion, Children's Hospital diagnosed T.N. with whiplash, cervicogenic headache, muscle spasms, poor posture, PTSD, anxiety, and mood disturbance.  ECF No. 51 at 9.

On March 20, 2019 plaintiffs' attorney sent the Park County School District a letter.  The letter notified the district of plaintiffs' intent to file federal and state claims against it.  The letter reads

> This is  written Notice of Civil Claim and Statement of Claim for legal relief and damages . . . . This Notice makes formal complaint of the damages suffered by [T.N.] and her family as a result of the physical and verbal actions and non-actions including bullying in a school setting, physical and verbal harassment, assault and battery, negligence, negligent and intentional infliction of emotional distress.  T.N. and the Neers hold valid claims for violations of Colorado's anti-bullying law, violations of the Claire Davis School Safety Act, violations under Section 504 of the Rehabilitation Act, violations under the American with Disabilities Act of 1990, and violations under the Individuals with Disabilities Education Act (IDEA).  My client seeks compensatory and punitive damages, attorney fees, and litigation costs and expenses.

ECF No. 51-13 at 3.  Plaintiffs' attorney filed this case on July 16, 2019.  ECF No. 1.

## II. PROCEDURAL BACKGROUND

The initial complaint filed in this case listed Park County School District Re No. 2, Andy Fieth, and Kyle Graff as defendants.  *Id.*  On July 23, 2019 plaintiffs voluntarily dismissed the claims against both Kyle Graff and Andy Fieth.  On September 9, 2019 plaintiffs filed an amended complaint and jury demand against the only remaining defendant, the school district.  ECF No. 15.  Defendant filed its answer on September 23, 2019.  ECF No. 17.

On June 22, 2020 defendant filed a motion for summary judgment.  ECF No. 37.

Plaintiffs filed their response on July 12, 2020, and defendant filed its reply on July 17, 2020.

ECF Nos. 51, 52.  On July 3, 2020 plaintiffs filed a motion for partial summary judgment.  ECF

No. 45.  Defendant filed its response on July 21, 2020, and plaintiffs filed their reply on July 21,

2020.  ECF Nos. 55, 56, 66.  The parties' motions are ripe for review.

### III. STANDARD OF REVIEW

A court may grant summary judgment if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

moving party has the burden to show that there is an absence of evidence to support the

nonmoving party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The

nonmoving party must "designate specific facts showing that there is a genuine issue for trial."

*Id.* at 324.  A fact is material "if under the substantive law it is essential to the proper disposition

of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is genuine if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248.  The court will examine the factual record and make reasonable

inferences in the light most favorable to the party opposing summary judgment.  *See Concrete*

*Works of Colo., Inc. v. City and Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

Where, as here, the parties file cross-motions for summary judgment, each motion is

considered separately and "the denial of one does not require the grant of another."  *Buell*

*Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).  The court is entitled to assume

that no evidence needs to be considered other than that filed by the parties, but summary

judgment is nevertheless inappropriate if disputes remain as to material facts. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Fed. Ins. Co.*, 213 F. Supp. 3d 1333, 1339 (D. Colo. 2016), *aff'd*, 734 F. App'x 586 (10th Cir. 2018) (unpublished). "[T]he reasonable inferences drawn from affidavits, attached exhibits, and depositions are rendered in the light most favorable to the non-prevailing party." *Id.* (citing *Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004)).

## IV. ANALYSIS

Defendant moves for summary judgment on two grounds. First, defendant argues this Court lacks subject matter jurisdiction over plaintiffs' claims because plaintiffs failed to exhaust administrative remedies under the Individuals with Disabilities Education Act ("IDEA"). ECF No. 37 at 1. Second, defendant contends that even if the Court has subject matter jurisdiction, the undisputed evidence demonstrates that defendant reasonably accommodated T.N.'s disability in compliance with Section 504 and the ADA. *Id.*. I first determine whether this Court has subject matter jurisdiction to hear plaintiffs' claims.

## A. <u>Whether the Court has subject-matter jurisdiction over plaintiffs' claims</u>

Although plaintiffs only allege that defendant violated Title II of the ADA and Section 504 of the Rehabilitation Act, IDEA is a third potentially relevant piece of legislation that protects children with disabilities in educational settings. Title II forbids any public entity, including public schools, from discriminating based on an individual's disability, and "Section 504 applies the same prohibition to any federally funded program or activity." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017) (citing 42 U.S.C. §§ 12131–12132). IDEA, however, "offers federal funds to States in exchange for a commitment to furnish a 'free appropriate public education' ("FAPE") to children with certain disabilities . . . and establishes formal

administrative procedures for resolving disputes between parents and schools concerning the provision of a FAPE." *Fry*, 137 S. Ct. at 746.  Plaintiffs who allege denial of a FAPE must exhaust administrative remedies.  *Id.* at 750.

Defendant argues that this Court lacks subject matter jurisdiction because plaintiffs did not exhaust IDEA's administrative remedies prior to filing suit.  ECF No. 37 at 10.  Although plaintiffs have not pled a claim under IDEA, defendant contends that plaintiffs' in essence seek remedies for the denial of a FAPE, and that exhaustion is therefore required.  Plaintiffs counter that they are alleging discrimination, not the denial of a FAPE, and therefore exhaustion is not required.  ECF No. 51 at 12.

IDEA "creates a mandatory administrative framework for resolution of disputes over the education of children with disabilities."  *Carroll v. Lawton Indep. Sch. Dist. No. 8*, 805 F.3d 1222, 1227 (10th Cir. 2015).  This framework gives any parent who alleges that their child was denied a FAPE the right to an impartial due process hearing conducted by a "State educational agency or the local educational agency, as determined by State law or by the State educational agency."  *Id.* (citing 20 U.S.C. § 1415(f)(1)(A)).  If the parent is unsatisfied with the agency's determination, they also have a right to appeal.  *Id.*  These administrative procedures must be exhausted prior to a parent's filing a civil action that seeks relief under the IDEA.  If the administrative procedures are not exhausted, the Court does not have subject matter jurisdiction to hear the case.  *Cudjoe v. Indep. Sch. Dist. No. 12*, 297 F.3d 1058, 1063 (10th Cir. 2002).

IDEA, however, is not the only statutory framework that protects children with disabilities in educational settings.  Both the ADA and the Rehabilitation Act protect children with disabilities in public facilities or facilities that receive federal funding, including schools.

While Congress did not intend IDEA to infringe on other federal statutes that protect children with disabilities, IDEA's exhaustion requirements can extend to these other acts in certain instances.  20 U.S.C. § 1415 reads,

> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the [ADA], Title V of the Rehabilitation Act [including § 504], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [IDEA's administrative procedures] shall be exhausted to the same extent as would be required had the action been brought under [the IDEA].

Thus, the IDEA "reaffirms the viability of federal statutes like the ADA or Rehabilitation Act as separate vehicles, no less integral than the IDEA, for ensuring the rights of handicapped children." *Fry*, 137 S. Ct. at 750.  However, a plaintiff who brings a claim under the ADA or the Rehabilitation Act must first exhaust administrative procedures when "seeking relief that is available under [the IDEA]."  20 U.S.C. § 1415.

In *Fry*, the Supreme Court clarified what relief is available under the IDEA.  The Court explained, "[t]he only relief that an IDEA officer can give—hence the thing a plaintiff must seek in order to trigger Section 1415(l)'s exhaustion rule—is relief for the denial of a FAPE." *Fry*, 137 S. Ct. at 753.  If plaintiffs allege such a denial, they cannot escape exhaustion requirements merely by bringing the claim under either the ADA or the Rehabilitation Act.  However, if the remedy sought under a different statute is not for the denial of a FAPE, then IDEA's exhaustion requirements are not triggered.  Thus, the central inquiry before the Court is whether plaintiffs seek relief for the denial of a FAPE.  To determine whether a plaintiff seeks such relief, courts are directed to determine the "gravamen of the complaint." *Id.*  A court's examination of the complaint "should consider substance, not surface." *Id.* at 755.  "What matters is the crux . . . of the plaintiff's complaint, setting aside any attempts at artful pleading." *Id.*  In addition to

looking at the complaint, "[a] further sign that the gravamen of a suit is the denial of a FAPE can emerge from the history of the proceedings." *Id.* at 757.

In determining whether the substance of a plaintiff's complaint involves the denial of a FAPE, courts consider two hypothetical questions. The first asks "could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school?" *Id.* at 756. The second asks "could an adult at the school—say an employee or visitor—have pressed essentially the same grievance?" *Id.* The importance of these questions is explained in *Fry*:

> When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably concerns a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

*Id.*

*Fry* also presents two hypothetical examples to show the types of claims that in essence allege denial of a FAPE, and those that do not. The first example involves a school that does not have access ramps for students in wheelchairs. The Court explains that

> In some sense, that architectural feature has educational consequences, and a different lawsuit might have alleged that it violates the IDEA: After all, if the child cannot get inside the school, he cannot receive instruction there; and if he must be carried inside, he may not achieve the sense of independence conducive to academic (or later to real-world) success. But is the denial of a FAPE really the gravamen of plaintiff's Title II complaint?

*Id.* at 756. The Court concludes that such a case does not involve a FAPE, because "its essence is equality of access to public facilities, not adequacy of special education." *Id.* The *Fry* Court contrasts this example with a second that involves a student with a learning disability who "sues

his school under Title II for failing to provide remedial tutoring in mathematics." *Id*. at 756–57.

For that example, the Court says,

> That suit, too, might be cast as one for disability-based discrimination, grounded on the school's refusal to make a reasonable accommodation; the complaint might make no reference at all to a FAPE or IEP. But can anyone imagine the student making the same claim against a public theater or library? Or, similarly, imagine an adult visitor or employee suing the school to obtain a math tutorial? The difficulty of transplanting the complaint to those other contexts suggests that its essence—even though not its wording—is the provision of a FAPE . . . .

*Id.* at 757.

*Fry* therefore distinguishes claims that allege denial of equal access to public facilities and those that allege denial of adequate special education services. *Id.* at 756. Ultimately, if a claim deals with denial of access to facilities, it is likely a simple discrimination claim unrelated to the IDEA's FAPE requirement. When the claim alleges inadequate educational services, however, it likely involves the denial of a FAPE, and exhaustion is likely triggered.

Other circuits have relied heavily on this distinction when addressing whether IDEA exhaustion is required. *See D. D. by & through Ingram v. Los Angeles Unified Sch. Dist.*, 984 F.3d 773 (9th Cir. 2020) (finding that exhaustion was not required because "the complaint repeatedly highlights D.D.'s exclusion from the classroom, not the inadequacy of his experience in the classroom."); *L.G. by & through G.G. v. Bd. of Educ. of Fayette Cty., Kentucky*, 775 F. App'x 227, 231 (6th Cir. 2019) (unpublished) (holding that exhaustion was required because despite [plaintiff's] emphasis on the word access, the law "draw[s] a distinction between 'equality of access to public facilities,' which is more properly characterized as a discrimination claim, and the denial of a FAPE, 'which concerns the adequacy of special education."). *Heston, Next Friend of A.H v. Austin Indep. Sch. Dist.*, 816 F. App'x 977 (5th Cir. 2020) (unpublished)

(holding that exhaustion was required because the complaint concerned the adequacy of A.H.'s IEP, and that "A.H. would have no claim for failure to accommodate in a public theater or library because those facilities are not required to accommodate a learning disability by providing a trained and supervised aide."). Keeping this law in mind, I turn to plaintiff's claims.

From the outset, the Court acknowledges that the relief plaintiffs seek is damages, not the denial of a FAPE. Prior to *Fry*, the Tenth Circuit acknowledged that damages are "ordinarily unavailable in administrative hearings held pursuant to [IDEA]." *Cudjoe*, 297 F.3d at 1066. However, the Circuit explained that "a plaintiff cannot avoid exhaustion simply because he or she asks for damages." *Id.* The complaint also does not explicitly mention either a FAPE or the IDEA. But the *Fry* court, like the *Cudjoe* court, cautioned courts against "artful pleading" and stated that a "magic words approach would make Section 1415(l) too easy to bypass." *Fry*, 137 S. Ct. at 756. The Court accepts that plaintiffs' complaint on its surface does not mention the school's denial of a FAPE; however, it is the substance of plaintiffs' complaint that matters.

In characterizing plaintiffs' claims and the harms T.N. suffered, the complaint repeats that T.N. was denied equal access to various educational opportunities in violation of Section 504 and Title II of the ADA. It states that T.N. was denied "access to education;" that she was denied "meaningful access to the benefits, services, and programs provided by her middle school;" that the Defendant failed to provide equal educational access for TN; and that the defendant "intentionally denied T.N. equal access to education by failing to provide educational services." ECF No. 15 at 1, 3, 14. I must therefore consider whether the substance of these allegations—defendant's denying T.N. equal access to education—involve simple discrimination or the denial of a FAPE.

The Tenth Circuit has not had an opportunity to reexamine the IDEA exhaustion analysis since *Fry*, and, therefore I rely heavily on *Fry* and how other jurisdictions have considered the issue. I first consider *Fry*'s two hypothetical questions. The parties disagree on how broadly the questions should be characterized and, unsurprisingly, how they should be answered. According to defendant, because the crux of plaintiffs' claims involves T.N.'s being denied equal access to education, the scope of the questions must necessarily involve equal access to education. Therefore, defendant answers the first question—whether a student could bring the same claim against another public entity—in the negative. According to defendant, a student could not bring the same claim against another public facility, say a library or theater, because such places do not have an obligation to provide individuals equal access to educational opportunities. ECF No. 37 at 12. As for the second *Fry* question—whether an adult could bring the same claim against a school—defendant argues that an adult, say a teacher or other school employee, could not bring a claim against the school for its denying equal access to education, because only students have a right to an education in the public school setting.

Rather than framing the questions in the access to education context, plaintiffs use a broader failure-to-accommodate context. Plaintiffs frame the first *Fry* question as whether a public facility would be required to accommodate a child with a concussion. Plaintiffs answer this question in the affirmative and state that "[a]ny entity subject to the ADA or Rehabilitation Act would have been required to give a reasonable accommodation for [T.N.'s] concussion." ECF No. 51 at 14. As to question two, plaintiffs frame the question as whether a teacher could bring a claim against defendant if it failed to accommodate the teacher's temporary disability. Plaintiffs again answer the question in the affirmative. Plaintiffs argue that "if a teacher,

inarguably suffered from a severe concussion . . . the District would be exposed for the same kind of damages as are sought in this case if it ignored the medical accommodations request." *Id.*.  I agree that the District would be obligated to accommodate a teacher who suffered a concussion, and I agree that public entities—like theaters and libraries—must also accommodate individuals with disabilities.  However, I disagree with how broadly plaintiffs' frame the questions.

First, the *Fry* court itself acknowledges that a narrower reading of the questions is appropriate.  I discussed the two *Fry* hypothetical scenarios above.  One involved a school that did not provide a child with a disability access to remedial math tutoring.  The Court wrote, "[b]ut can anyone imagine the student making the same claim against a public theater or library? Or, similarly, imagine an adult visitor or employee *suing the school to obtain a math tutorial*?" *Fry*, 137 S. Ct. at 757 (emphasis added).  Thus, the question is not whether an adult could generally bring a failure to accommodate claim, it is instead whether an adult could allege the same specific harm the child suffers, i.e., denial of math tutoring specifically, not denial of an accommodation generally.  Plaintiff's broader articulation of the questions is therefore incorrect.

The *Fry* questions must be framed in the specific context of the harms alleged in the complaint.  As the Ninth Circuit stated, "§ 1415(*l*) treats the plaintiff as 'the master of the claim:' [the plaintiff] identifies its remedial basis—and is subject to exhaustion or not based on that choice." *D.D. by and through Ingram*, 984 F.3d at 789 (internal quotations omitted).  Here, plaintiffs characterized T.N.'s harm as her being deprived of equal access to education.  The first *Fry* question is therefore, could a student bring this same claim—alleging unequal access to education—against a theater or library?  The answer is no.  While theaters, libraries, and other

public facilities must accommodate individuals with disabilities, they do not have an obligation to provide individuals with access to education.  The proper phrasing of the second *Fry* question is "could an adult bring the same unequal access to education claims against the school?"  The answer is again no because schools are not required to provide adults with equal access to education.  Thus, because the *substance* of plaintiff's claims involves "meaningful access" to education and educational opportunities, the answer to both questions is no, and "the complaint probably does concern a FAPE, even if it does not explicitly say so . . . ."  *Fry*, 137 S. Ct. at 756.

In addition to the *Fry* questions, that plaintiffs allege inadequacies in T.N.'s education—not denial of access to facilities—further supports a finding that the substance of this suit involves the denial of a FAPE.  As mentioned above, numerous circuits have placed great weight on this distinction when determining the substance of a plaintiff's claim.  Here, nothing in the complaint alleges that T.N. was prevented from accessing public facilities.  Unlike the *Fry* example in which a school did not have wheelchair ramps, and the student could not physically get into the building, plaintiffs claim that T.N. did not have access to educational services.  Like the plaintiff in *L.G.,* plaintiffs repeatedly use the word "access" throughout the complaint, however that word alone does not transform their claims into simple discrimination claims.  T.N.'s alleged lack of access has nothing to do with public facilities.  It instead deals with the adequacy of the education that defendant provided.  Therefore it seems that the gravamen of plaintiffs' complaint is the denial of a FAPE under IDEA, not simple discrimination under either Title II of the ADA or Section 504 of the Rehabilitation Act.

Comparison of the facts here to a similar case from the Third Circuit further supports that plaintiffs' claims involve denial of a FAPE.  In *Wellman v. Butler Area Sch. Dist.*, a student

suffered multiple head injuries that resulted in a concussion.  He filed suit and alleged claims under both the Rehabilitation Act and the ADA as a result of the school's failing to accommodate his disability.  877 F.3d 125, 129 (3rd Cir. 2017).  The accommodations he sought included: "removing him from German and physical education classes, providing him with extra study halls, tutors, and additional time to complete assignments, and conveying to the teachers and football coach that he not engage in any unsuitable activity that might aggravate his symptoms and condition."  *Id.* at 133.  The plaintiff claimed that he was not given appropriate levels of support to address his concussion.  The Court held that the substance of Wellman's claims was denial of a FAPE under IDEA, and that exhaustion was therefore required.  The *Wellman* court explained that

> Application of the *Fry* framework to Wellman's entire complaint and each of his claims shows that his grievances all stem from the alleged failure to accommodate his condition and fulfill his educational needs.  A review of his detailed factual allegations shows that the conduct about which he complains would not have occurred outside the school setting and that a nonstudent could not (and would not) have pressed essentially the same grievance.

*Id.*

The facts of *Wellman* track closely with the facts before the Court.  Here, T.N. also suffered a concussion and alleged discrimination under the Rehabilitation Act and ADA.  Her bases for these claims, like the plaintiff in *Wellman*, were the school's failure to reasonably accommodate T.N.'s concussion.  The accommodations T.N. sought were also nearly identical to the plaintiff's in *Wellman*.  They included: "workload reduction, allowing her to take breaks, allowing her extra time for assignments and tests, and excusing her from the final two classes each day until she recovered."  ECF No. 15 at 5.  Thus, the Court follows the Third Circuit's

analysis and finds that the gravamen of plaintiffs' complaint seeks redress for defendant's failure to provide T.N. with a FAPE, not for simple discrimination.

The history of proceedings is another clue a court may consider when determining whether denial of a FAPE is at the center of plaintiffs' claims. "In particular, a court may consider that a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute—thus starting to exhaust the Act's remedies before switching midstream." *Fry*, 137 S. Ct. at 758.

Here, defendant argues that the history of the case supports a finding that IDEA exhaustion is required. ECF No. 37 at 12. According to defendant "[p]laintiffs confirmed during discovery that they were seeking denial of a FAPE" because most of their deposition topics "focused on the District's procedures for identifying, evaluating, and providing services to students with disabilities." *Id.* Plaintiff counters that "[d]efendant mistakes the focus of the discovery it complains of as related to IDEA. In reality this discovery was sought to demonstrate the intentionality component of the discrimination directed at T.N., and not the denial of a FAPE." ECF No. 51 at 15.

The Court need not comb through all of the discovery to determine how plaintiffs phrased their deposition questions or interrogatories. The complaint on its own, coupled with the *Fry* hypotheticals, and the overwhelming authority cited above, all support the finding that the gravamen of the plaintiffs' complaint was the denial of a FAPE. Because plaintiffs allege denial of a FAPE, exhaustion is required.

## B. Whether plaintiff has exhausted administrative remedies

Although plaintiffs' primary argument is that exhaustion is not required, in the alternative they contend they have already exhausted administrative remedies. According to plaintiff, they exhausted IDEA's administrative procedures when they sent defendant their notice of claim on March 20, 2019 pursuant to Colo. Rev. Stat. 24-10-109, and the Colorado Governmental Immunity Act. *See* ECF No. 51-13 at 3. Defendant argues that this letter is insufficient to establish exhaustion. I agree.

To exhaust IDEA's administrative procedures, "the plaintiff must first submit her case to an IDEA hearing officer, experienced in addressing exactly the issue she raises." *Fry*, 137 S. Ct. at 754. The plaintiff must also "obtain a due-process hearing before an impartial hearing officer—an ALJ." *C.W. by & through B.W. v. Denver Cty. Sch. Dist. No. 1*, No. 17-CV-2462-MSK-SKC, 2019 WL 4674331, at *7 (D. Colo. Sept. 25, 2019). Additionally, administrative exhaustion serves important purposes. As the Tenth Circuit explained in *Cudjoe*,

> Aside from the unique advantages realized by the student from having educational experts address the shortcomings in the student's education in the first instance, other benefits flow from requiring exhaustion of administrative remedies, such as allowing the agency to exercise its own discretion and correct its own mistakes, and to develop technical issues and a factual record fully prior to court review.

*Cudjoe*, 297 F.3d at 1065.

Here, plaintiffs sent a letter to defendant that expressed their intent to file claims against it in both federal and state courts. The letter only mentions IDEA twice, and only to notify defendant that plaintiffs intended to file an IDEA claim in court, not to notify it of their intention to request a hearing pursuant to IDEA's procedures. Additionally, this letter on its own does not

provide any of the "unique advantages" of exhaustion that the *Cudjoe* court recognizes.  It did not give the District an opportunity to "address the shortcomings in [T.N.'s] education," or to "develop a factual record by an agency with expertise."  *Id.*

Further, plaintiffs cite no legal authority supporting their contention that such a letter can qualify as exhaustion under IDEA.  Instead, they cite to the acting superintendent's deposition testimony.  The acting superintendent stated that while a written complaint should be filed to trigger IDEA's administrative procedures, it is not necessary to use the form or template provided on defendant's website.  Plaintiffs use this admission to contend that any written form will do, even one that does not relate to IDEA or request a due process hearing or investigation. The Court is unpersuaded.

The Court therefore finds that because plaintiffs alleged denial of a FAPE, administrative exhaustion is required.  Additionally, plaintiffs have not exhausted administrative remedies in this context.  The Court therefore is without subject matter jurisdiction and dismisses the case without prejudice.  The remaining motions in this case are moot.

## **ORDER**

1. Defendant's motion for summary judgment, ECF No. 37 (public entry No. 50), is GRANTED.

2. Plaintiff's partial motion for summary judgment, ECF No. 45, is MOOT.

3. Defendant's motion in limine, ECF No. 67, is also MOOT.

4. The Court enters its final written judgment dismissing this civil action without prejudice.  As the prevailing party, defendant is awarded reasonable costs pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1, to be taxed by the Clerk following the submission of a bill of costs pursuant to the rule

DATED this 26th day of March, 2021.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge